Filed 8/13/15  P. v. Barton CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KEITH ALLEN BARTON,<br><br>Defendant and Appellant. | D065634<br><br><br>(Super. Ct. No. SCD245424) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed as modified.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Keith Allen Barton guilty of six counts of practicing medicine without a license (Bus. & Prof. Code, § 2052, subd. (a), counts 1, 2, 5, 8, 10 &

11), one count of false personation (Pen. Code, § 529, subd. (a)(3),[1] count 3), two counts of grand theft (§ 487, subd. (a), counts 4 & 9), and one count of attempted grand theft (§§ 487, subd. (a)/664, count 7).  The court sentenced Barton to five years in local custody and one year four months of mandatory supervision, imposed various restitution and other fines and fees, and imposed various conditions on Barton during his period of mandatory supervision.

Barton contends the judgment must be reversed because the court prejudicially abused its discretion when it denied his request for a continuance of trial, and improperly allowed the admission of highly prejudicial evidence.  He also raises several challenges to the sentence.

I

FACTS

*Lisa Z. and her children* (*Counts 1-5*)

Lisa Z. and her children, V. and Z., were HIV positive.  In 2009, Lisa was searching for an alternative treatment for her children's HIV, and was seeking someone who specialized in immunology and HIV.  She conducted internet research for doctors in the San Francisco Bay area (where she lived) and found a web page containing information about a Dr. Keith Barton in Berkeley, California.  However, the phone

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

number listed for Dr. Barton did not work.[2]  Lisa conducted further internet research and found a web site for a "Dr. Keith Barton" in La Mesa, California, which indicated he specialized in immunology and HIV.

Lisa contacted Barton through the telephone number listed on the website for the "Dr. Keith Barton" in La Mesa, California, and also corresponded with him by emails sent to two email addresses (drkeithbarton@gmail.com and bestremedy@yahoo.com) she found on the website.  They discussed cellular dendritic therapy, which she was told could help people with HIV or cancer.  Lisa had searched California's Medical Board site and saw that a "Dr. Keith Barton" was a licensed medical doctor.  She discussed with Barton that she noticed he had moved from Berkeley, and he responded that he had.

Barton recommended dendritic cell therapy but wanted the children to first take a course of herbal remedies, and he provided Lisa with instructions on where to acquire the herbal remedies and how to administer them.  He explained that, once the herbal regimen was completed, they could proceed with the dendritic cell therapy, which involved drawing blood from the children that would be processed and reinjected into them.  Lisa followed Barton's instructions for the herbal treatments but saw no improvement.  Lisa ultimately paid Barton $9,000 per child for the dendritic cell therapy, and Barton sent Lisa vials, needles and cooling packages to collect the blood.  Lisa understood the blood would be drawn and sent to the International Holistic Clinic in La Mesa for processing and would be returned for reinjection into her children.  During the time Lisa dealt with

2    Dr. Keith Barton, a medical doctor licensed in California, testified he had closed his Berkeley office in 1991.

Barton, he also asked her for her children's dental x-rays and recommended she give them superzyme.

When Lisa's daughter's condition continued to deteriorate, she asked Barton to examine her, but he declined. Lisa also kept pressing him about the blood draw, and when he told her that she would have to do the draw, she asked why he couldn't "order a lab" to have a professional draw the blood. He told her he could not do that because he was not a medical doctor. Lisa's daughter eventually died in late 2010.

*Laurel Light* (*Counts 8-11*)

Douglas Light searched for a naturopath on the internet, where he found Barton, to help his sick wife, Laurel. During the course of their relationship, Barton told Douglas that he was not a medical doctor but was a naturopathic doctor.

During an initial telephone conversation, Douglas told Barton that Laurel was weak and had dental issues, and Barton asked to see Laurel's dental x-ray record. Around May 28, 2010, Barton met with Douglas and Laurel at their home and they paid Barton $250 to review the x-rays. Barton said that, although he was not a dentist, he had "enough experience in looking at those" and stated the doctors in Tijuana would provide a more detailed analysis. In a subsequent telephone call, Barton gave Douglas a "rundown" of what they had found and recommended removal of all of Laurel's teeth to rid Laurel of the metal poisoning she was experiencing. Barton asked them to pay him $16,342 to cover the dental work and follow-up dendritic cell therapy.

Barton drove Douglas and Laurel to a clinic in Tijuana to have dental impressions taken, and on June 30, 2010, he again drove them (along with a nurse, Ms. Eisele, who

4

would provide postoperative care for Laurel) to the Tijuana clinic to have the dental surgery. Barton and the nurse remained in the surgical room during the dental surgery and appeared to be in charge of the postsurgical cleanup process. After the surgery, Barton drove them to a hotel room near the border that had been set up to provide for Laurel's postoperative recovery, and examined Laurel before departing. However, because Laurel was in a great deal of pain, Barton returned later that night and injected Laurel with a pharmaceutical pain killer. The nurse, Ms. Eisele, stayed with Douglas and Laurel at the hotel room and administered the herbal regimen prescribed by Barton.

After the dental surgery, Laurel underwent two courses of dendritic cell therapy prescribed by Barton. During the initial course, for which Barton charged $8,760, Barton went to Laurel's home, accompanied by a person whom he identified as a Dr. Varga, to draw Laurel's blood. Six weeks after the blood draw, Barton delivered to Laurel 13 vials of the processed blood, along with hypodermic needles, and Barton demonstrated how to administer the blood by loading the needle and injecting it into Laurel. Laurel followed the prescribed treatment for 12 weeks but it had no impact. Barton prescribed a second course of dendritic cell therapy, for which he was paid an additional $7,000, but this second course was also ineffective. Laurel also took a constant regimen of herbs prescribed by Barton over the six months following the dental surgery. Douglas and Laurel also paid Barton for the dentures Laurel was to receive. They finally terminated their relationship with him in approximately May of 2011.

5

*"Karen Brown"* (*Counts 6-7*)

Robin Hollis was an undercover operative who posed as "Karen Brown" to investigate Barton's actions. She contacted Barton by telephone in December 2012 and claimed she was suffering a colon cancer recurrence and was interested in alternative therapies. Barton asked for her medical history and provided her with email addresses (drkeithbarton@gmail.com and bestremedy@yahoo.com) to which to send her history. Over the course of several telephonic conversations, she told him she was seeking dendritic cell therapy and they discussed this during their conversations, and he told her this would assist in curing her cancer. He told her dendritic cell therapy would cost $8,760 and that her insurance would not cover it.

During one of their telephone conversations, recorded and played for the jury, Barton sensed she was hesitant and stated she had to "get through this" because she was "very sick." "Brown" said she was comforted when she saw on the internet that Barton was a doctor, and he replied, "Okay." She also mentioned she saw Barton used to be in Northern California, and he replied "I, at one time, uh huh." He also stated that "God sends [him] people" and told her about being in "med school." He also claimed he was an iridologist and that 45 percent of his patients were doctors or their family members.

Brown arranged a meeting with Barton on January 8, 2013. She wrote a check for $8,760, payable to "Dr. Keith Barton," and gave it to Barton. Barton was arrested. He admitted he was not licensed to practice any medical arts in California.

*Expert Testimony*

An expert testified that to practice medicine meant "to evaluate patients, to make a diagnosis, and to make treatment," and that "even separately [each] would mean practice of medicine." He testified Barton practiced medicine on Lisa's children by diagnosing them and treating them by advising dendritic cell therapy and dietary supplements. He also testified Barton diagnosed Laurel and "treated" her at "several levels." He also testified Barton diagnosed Brown and prescribed a treatment for her cancer.

II

CHALLENGES TO CONVICTIONS

A. Denial of Continuance

Barton first asserts the court abused its discretion when it denied his motion to continue trial to obtain the testimony of a proposed witness, a doctor from Mexico, who purportedly would have provided material evidence supporting Barton's defense.

*Background*

On the day scheduled for the trial, the defense moved for a continuance of the trial, asserting it had recently discovered the telephone number of a doctor from Mexico (identified as Dr. Santa Cruz) who was among the group of doctors in Mexico with whom Barton had a working relationship. The defense noted that obtaining Dr. Cruz's attendance at trial was problematic, both because of Dr. Cruz's job (as a physician) and his residence (in Mexico), and therefore argued a continuance was proper because the testimony was material to the defense but Dr. Cruz could not be produced in time for the currently scheduled trial dates. The prosecution opposed the motion, noting the case had

7

been pending for a year, and had already been subjected to multiple continuances, and current counsel had been on the case for five to six months. The prosecution also noted it had two medical doctors under subpoena who had been required to clear their schedules to be available to testify, and asserted the newly proposed witness would not be able to provide material evidence because he was not involved at all with any of the victims' cases, and therefore Dr. Cruz's relationship with Barton was not relevant to the charges in this trial.

The court denied the request, finding the speculative nature of Dr. Cruz's possible testimony was insufficient to show the materiality of that testimony, and sent the matter to a trial court. During pretrial motions before the trial judge, Barton resurrected his motion for a continuance, suggesting that because Barton "possibly" referred patients to Dr. Cruz in the same way the victims here would have been referred, the evidence was material for the jury to learn about how Barton interacted with licensed medical professionals. The prosecution noted there was no evidence Dr. Cruz could provide material or relevant testimony because there was no claim he had any involvement with any of the victims' cases, and any professional relationship between Barton and Dr. Cruz would be irrelevant to whether Barton's conduct in this case involved the unlicensed practice of medicine. The prosecution also noted it had witnesses "already en route" from San Francisco and Hawaii, two of whom were medical doctors who had been required to clear their schedules to attend the presently scheduled trial dates, and argued that because defendant had ample time to locate and obtain Dr. Cruz's attendance, the continuance should be denied. The prosecution also agreed that, if given some kind of proof that Dr.

8

Cruz is in fact a licensed doctor in Mexico, the prosecution would stipulate Dr. Cruz is a doctor in Mexico with whom Barton had a professional relationship.[3]  The court then denied the renewed request for a continuance.

*Legal Framework*

A party is entitled to seek a continuance provided he or she demonstrates good cause, but "[t]he granting or denial of a continuance during trial traditionally rests within the sound discretion of the trial judge." (*People v. Howard* (1992) 1 Cal.4th 1132, 1171.) "[T]o invoke the discretion of the trial court to grant a continuance to obtain the presence of a witness, the moving party has the burden of showing that the following legal criteria have been satisfied: (1) That the movant has exercised due diligence in an attempt to secure the attendance of the witness at the trial by legal means; (2) that the expected testimony is material; (3) that it is not merely cumulative; (4) that it can be obtained within a reasonable time; and (5) that the facts to which the witness will testify cannot otherwise be proven." (*People v. Wilson* (1965) 235 Cal.App.2d 266, 273.)  On appeal, "[t]he burden is on [the defendant] to establish an abuse of judicial discretion . . . ." (*People v. Rhines* (1982) 131 Cal.App.3d 498, 506.)

*Analysis*

We conclude Barton has not demonstrated the trial court abused its discretion when it denied his request for a continuance.  First, Barton cannot demonstrate diligence.

---

[3]  However, when the parties were discussing jury instructions several days later, and the court asked whether the parties had reached a stipulation as to Dr. Cruz, defense counsel indicated Cruz "never faxed me his license" to provide a factual basis for the prosecution's proposed stipulation.

Even though the case had been pending for a year, and Dr. Cruz's contact information was presumably readily available to Barton, the defense waited until one month before trial before trying to contact him. A trial court could well conclude the diligence aspect was not satisfied. Second, the defense did not show "the facts to which the witness will testify cannot otherwise be proven." (*People v. Wilson, supra,* 235 Cal.App.2d at p. 273.) Barton claimed to have worked with 200 doctors in Mexico, any one of whom could have provided the same information as Dr. Cruz. Moreover, the prosecution's proposed stipulation would have provided the same evidence, but the defense was unable to timely provide proof of Dr. Cruz's license and therefore eviscerated the factual underpinnings for that stipulation.

Finally, "[a]n important factor for a trial court to consider is whether a continuance would be useful. [Citation.] . . . [T]o demonstrate the usefulness of a continuance a party must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time." (*People v. Beeler* (1995) 9 Cal.4th 953, 1003, abrogated on other grounds by *Crawford v. Washington* (2004) 541 U.S. 36; see *People v. Edwards* (2013) 57 Cal.4th 658, 704-705.) Here, neither element was adequately demonstrated. Even assuming Dr. Cruz was a licensed medical professional in Mexico, a fact defense counsel was apparently unable to verify, the record at most suggests that Dr. Cruz would have testified Barton had in the past referred patients to him. However, there was no showing that evidence could have been obtained within a reasonable time (since Dr. Cruz was not subject to the subpoena powers of a California court and was too occupied to even fax a copy of his license to defense

10

counsel) and, more importantly, it was not *material* evidence. Whether Barton referred patients to Dr. Cruz is irrelevant to whether Barton practiced medicine in California without a license, or committed grand theft as to these victims, or engaged in false personation. Barton has not satisfied his burden to show that denial of the continuance was an abuse of judicial discretion. (*People v. Rhines, supra,* 131 Cal.App.3d at p. 506.)

B. The Irrelevant Evidence

Barton next asserts the court erroneously admitted evidence that one of Lisa's daughters died in late 2010, and admission of this inflammatory evidence deprived him of a fair trial.

*Background*

Barton moved in limine at trial to exclude evidence "of a connection between [Barton's] actions and [Lisa's daughter's] death," arguing it would be highly prejudicial and that any probative value would be outweighed by its prejudicial impact. Barton's counsel conceded there was "an element" of the prosecution's case "with regard to whether or not the actions [by Barton] place[d] somebody at risk of great bodily injury or death or serious harm," but argued the evidence should be limited to showing that Barton's actions "could place that person in risk of harm [but] I don't believe [the jury] need[s] to know the end result . . . [and the prosecution's case] can be argued without that evidence." The prosecution argued the safe harbor provisions of Business and Professions Code section 2053.5 provided a defense to a claim of violation of section 2052, with which Barton was charged, but then removed that protection under section 2053.5, subdivision (a)(5), if the defendant "[w]illfully diagnoses and treats a physical or

11

mental condition of any person under circumstances or conditions that cause or create a risk of great bodily harm, serious physical or mental illness, or death," and therefore argued the evidence that Barton diagnosed and treated Lisa's daughter and that she subsequently died was germane to the issue of the potential application of the safe harbor provision. The defense agreed that is "definitely . . . a potential theory," and the court then ruled the evidence admissible under Evidence Code section 352 because the evidence, although prejudicial, was germane to an issue present in this matter.

At trial, the prosecution's expert testified Barton's treatment of Lisa's children created "a risk of harm, of bodily harm, and also of death." The jury learned Lisa's daughter had ceased following Barton's treatments in May 2010 and started receiving conventional treatment in May 2010 but subsequently died in December 2010. The defense did not present any evidence, and specifically did not present any evidence necessary under Business and Professions Code section 2053.5, to trigger the safe harbor defense.

*Legal Principles*

A trial court may exclude otherwise relevant evidence under Evidence Code section 352 when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time (*People v. Scott* (2011) 52 Cal.4th 452, 490) and "[o]n appeal, we review the trial court's rulings on the admissibility of evidence for abuse of discretion." (*Id*. at p. 491.) "Error in the admission or exclusion of evidence following an exercise of discretion under section 352 is tested for prejudice under the

12

[*People v. Watson* (1956) 46 Cal.2d 818] harmless error test." (*People v. Mullens* (2004) 119 Cal.App.4th 648, 659; accord, *People v. Alcala* (1992) 4 Cal.4th 742, 790-791.)

*Analysis*

We are convinced admission of the evidence of Lisa's daughter's death, although ultimately proven to have no probative value because the defense did not produce evidence that might have triggered the safe harbor provisions of Business and Professions Code section 2053.5, was at most harmless error. The evidence was clear, and largely unchallenged, that Barton lacked any license to practice medicine but nevertheless diagnosed and recommended treatments for each of the victims, and actually participated in treating Laurel, and the expert's opinion that Barton's actions constituted the practice of medicine was unrebutted by any contrary expert opinion. Under these circumstances, admission of the evidence that Lisa's daughter later died was harmless error.

## III

## CUMULATIVE ERROR

Barton contends the cumulative effect of the trial court errors he asserted in parts I and II above rendered his trial fundamentally unfair in violation of his due process rights. However, we have concluded there was no error in part I and therefore there were no cumulative errors.

13

IV

CHALLENGES TO SENTENCE

Barton argues the trial court (1) abused its discretion when it imposed a term for count 9 to run consecutively to the term imposed on count 8, (2) imposed unauthorized fines, and (3) imposed improper conditions for his period of mandatory supervision.

A. The Consecutive Term Claim

*The Sentencing Choice*

Barton was charged with and found guilty of three counts of practicing medicine without a license in connection with his diagnosis and treatment of Laurel Light (counts 8, 10 & 11), and one count of grand theft of the personal property of Douglas and Laurel Light (count 9). The court imposed a consecutive eight-month term on count 8, and an additional consecutive eight-month term on count 9, stating each was imposed consecutively because of the separate nature of the offenses committed. The court also imposed three-year terms on each of counts 10 and 11 but ordered those to run concurrently to the other terms imposed because the crimes committed in counts 10 and 11 were so close in time to the crimes in counts 8 and 9 as to indicate a single period of aberrant behavior. Barton did not in the trial court object to the imposition of a consecutive eight-month term on count 9 or assert, as he does in this appeal, that the crime committed in count 9 was part of the same objective and purpose as the crime committed in count 8.

14

*Legal Framework*

A trial court has broad discretion in sentencing, including whether to run the prison terms on multiple offenses concurrently or consecutively. (*People v. Clancey* (2013) 56 Cal.4th 562, 579 [citing § 669 and Cal. Rules of Court, rule 4.425].)

*Analysis*

A defendant's claim that the trial court stated inadequate or erroneous reasons for imposing consecutive sentences is forfeited on appeal unless he timely and specifically objected below on the ground he seeks to raise on appeal. (*People v. Boyce* (2014) 59 Cal.4th 672, 730-731.) Because Barton raised no objection below, he has forfeited this claim of alleged error. Barton argues he adequately preserved the claim by asking for probation or the minimum possible sentence. That is inadequate to preserve the claim he now raises. (See, e.g., *People v Gonzalez* (2003) 31 Cal.4th 745, 755 [only specific grounds of objection to sentence raised below may be raised on appeal].) He alternatively asserts the claim may be resolved under the rubric of an ineffective assistance of counsel claim. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) Additionally, even had the objection been preserved, there was a sufficient basis for the imposition of consecutive terms, either because the trial court could have found the objectives of the unlawful practice counts differed from the grand theft count (Cal. Rules of Court, rule 4.425, subd. (a)(1)), or because the victim of the grand theft count included Douglas but the victim of the unlawful practice counts did not. (See, e.g., *People v. Calhoun* (2007) 40 Cal.4th 398, 408 ["[t]here is no persuasive reason why the trial court

15

should not be allowed to consider the fact of multiple victims as a basis for imposing either the upper term or a consecutive sentence"].)

B. The "Parole Revocation" Fine

The court imposed a restitution fine of $12,120 under section 1202.4 and an additional fine of $12,120 under section 1202.45. Barton first argues, and the People concede, the amount of these fines exceeded the statutory maximum of $10,000. We agree, and direct on remand that the amount of the fines be reduced to the statutory maximum of $10,000.

Barton also asserts the court's imposition of *any* fine under section 1202.45 was unauthorized because he was sentenced to a period in local custody, followed by a period of mandatory supervision and, because he was never subjected to the possibility of parole, any parole revocation fine was unauthorized. Prior to January 1, 2013, section 1202.45 provided only for a "parole revocation restitution fine." (Stats. 2007, ch. 302, § 15, p. 2457; Stats. 1995, ch. 313, § 6, p. 1758.) However, section 1202.45 was amended in 2012 to add subdivision (b), which takes account of the provisions of the Realignment Act. (Stats. 2012, ch. 762, § 1, p. 6125 [SB 1210].) As amended, section 1202.45, subdivision (b), now provides:

> "In every case where a person is convicted of a crime and is subject to either postrelease community supervision under Section 3451 or mandatory supervision under subparagraph (B) of paragraph (5) of subdivision (h) of Section 1170, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional postrelease community supervision revocation restitution fine or mandatory supervision revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4, that may be collected by the

16

agency designated pursuant to subdivision (b) of Section 2085.5 by the board of supervisors of the county in which the prisoner is incarcerated."

The amendment became effective January 1, 2013. Under the revised language, Barton was subject to a "mandatory supervision revocation restitution fine" in an amount equal to the fine imposed under section 1202.4, subdivision (b).  Certainly, courts have concluded a defendant sentenced in June 2012, facing postrelease community supervision instead of parole, was " 'not subject to a parole revocation restitution fine.' "  (*People v. Isaac* (2014) 224 Cal.App.4th 143, 146.)  However, unlike the defendant in *Isaac* (sentenced prior to the amendment that authorized a like fine for defendants sentenced under the Realignment Act), Barton was sentenced in 2014 after the amendment (authorizing a like fine for defendants in Barton's position) was in effect.

We conclude the judge properly imposed the mandatory supervision revocation restitution fine under section 1202.45, subdivision (b).  Although the judge did not specify which subdivision she was applying to impose the revocation fine, there was no necessity that any specific subdivision be specified. We presume the trial court was aware of and followed the applicable law (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114), and was therefore aware of and complied with the mandate for imposing a mandatory supervision revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of section 1202.4.  However, to clarify the record on remand, we direct the abstract of judgment be amended to specify the revocation fine was ordered pursuant to, and imposed according to the requirements of, section 1204.45, subdivision (b).

17

C. <u>The Conditions of Supervision Claim</u>

Barton finally challenges certain of the terms and conditions imposed by the court in connection with his period of mandatory supervision. He argues the conditions that he (1) attend "self-help" meetings if directed by the probation officer, (2) participate in the global position system (GPS) monitoring if directed by the probation officer,[4] and (3) "follow such course of conduct" that the probation officer communicates to him are impermissible conditions.

*Legal Principles*

As an initial matter, we assess the validity and reasonableness of conditions of mandatory supervision using the same standard applied to conditions associated with other forms of supervised release, including probation and parole (*People v. Martinez* (2014) 226 Cal.App.4th 759, 762-764), because the purposes and goals of both probation and supervised release are comparable: to provide an opportunity for successful reentry into the community. (§ 1170, subd. (a)(2); see *People v. Hackler* (1993) 13 Cal.App.4th 1049, 1058.)

---

[4] Barton also challenges the condition that purported to require him to reimburse the probation department $250,000 if the GPS equipment is not returned or is damaged, asserting the form on which this condition was listed limited the reimbursement amount to $2,500, and therefore contends this was an unauthorized amount. The People concede, and we agree, that the amount of $250,000 inserted into the blank space on the form exceeds the allowable limit of $2,500 and appears to have been mere clerical error, and the People concede, and we agree, that on remand the order should be amended to reflect that the condition requiring Barton to reimburse the probation department if the GPS equipment is not returned or is damaged should be $2,500.

18

In general, trial courts are given broad discretion in fashioning terms of probation or supervised release to foster the reformation and rehabilitation of the offender, while protecting public safety. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) The imposition of a particular condition of probation or supervised release is subject to review for abuse of that discretion. "As with any exercise of discretion, the court violates this standard when it imposes a condition of probation that is arbitrary, capricious or exceeds the bounds of reason under the circumstances." (*People v. Jungers* (2005) 127 Cal.App.4th 698, 702.) Generally, "[a] condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' [Citation.] Conversely, a condition of probation which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality." (*People v. Lent* (1975) 15 Cal.3d 481, 486, fn. omitted.)

However, constitutional challenges are reviewed under a different standard. Whether a term of probation is unconstitutionally vague or overbroad on its face presents a question of law, which we review de novo. (*In re J.H.* (2007) 158 Cal.App.4th 174, 183.)

We outline these distinctions because they are relevant to the issue of waiver here. Barton did not object to any of the mandatory supervision conditions he now seeks to challenge on appeal. When a defendant does not object below to a probation condition

19

on the ground that the condition allegedly offends the principles explained in *Lent,* the failure to object will waive any appellate challenge to that condition. (*People v. Welch* (1993) 5 Cal.4th 228, 237.) Our Supreme Court in *In re Sheena K.* (2007) 40 Cal.4th 875 reaffirmed its holding in *Welch* that, absent a timely objection in the trial court, on appeal a defendant may not challenge the reasonableness of a probation condition. (*Sheena K.*, at pp. 881-882.) However, the *Sheena K.* court also carved out a narrow exception to the waiver rule by holding that a claim a probation condition is unconstitutionally vague or overbroad can be raised for the first time on appeal so long as the claim presents a pure question of law that can be resolved without reference to the sentencing record. (*Id.* at pp. 887-889.) As the court in *Sheena K.* explained, the doctrine of forfeiture on appeal does not apply to challenges to probation conditions based on "facial constitutional defects" (*id.* at p. 886) that do "not require scrutiny of individual facts and circumstances." (*Id.* at p. 885.) However, the forfeiture doctrine *does* apply if the objection involves a discretionary sentencing choice or unreasonable probation conditions "premised upon the facts and circumstances of the individual case." (*Id.* at pp. 885, 888.)

*Analysis*

Barton argues that, even though he did not object to the challenged conditions at sentencing, the vagueness and overbreadth arguments present a facial constitutional challenge with pure questions of law based on undisputed facts and, thus, can be properly raised on appeal for the first time. To the extent his challenges raise pure questions of law, we reach the merits of his claim, focusing only on the constitutionality of the

20

condition, not whether it is reasonable as applied to defendant. (See *People v. Lent, supra*, 15 Cal.3d at p. 486 [test for reasonableness of probation conditions].) By failing to object below, Barton has forfeited all claims except a challenge based on the ground the condition is vague or overbroad and thus facially unconstitutional. (*In re Sheena K., supra*, 40 Cal.4th at p. 878.)

*The GPS Condition*

Barton contends the condition that he participate in GPS monitoring if directed by the probation officer was invalid, arguing it restricts conduct that is not criminal and is not reasonably related to the crime of which he was convicted or to future criminality. However, he did not object at trial that this condition was invalid under the standards articulated by *Lent*; to the contrary, he advocated *for* a period of mandatory supervision in lieu of jail time and acknowledged this would include potential GPS monitoring. Because he did not object below, and he makes no claim under *Sheena K.* that this condition was so facially vague or overbroad that he may attack this condition asserting those constitutional defects, his challenge to that condition on *Lent* grounds must be deemed waived.

*The Self-help Condition*

Barton next contends the condition he participate in self-help groups if directed by the probation officer was also invalid because it was not reasonably related to the crime of which he was convicted or to future criminality. Again, however, he did not object at trial that this condition was invalid under the standards articulated by *Lent*. Because he did not object below, and again makes no claim under *Sheena K.* that it was so facially

21

vague or overbroad that he may attack this condition asserting those constitutional defects, his challenge to that condition on *Lent* grounds must also be deemed waived.

*The Compliance Condition*

Barton's final challenge asserts the condition that he "follow such course of conduct" that the probation officer communicates to him is facially vague and overbroad because it does not communicate fair and adequate notice of what conduct is required or prohibited. Because this is the only challenge that approaches the type of facial vagueness or overbreadth challenge that *Sheena K.* instructs may be raised on appeal without an objection below, this claim is preserved notwithstanding the absence of any objection.

However, we reject Barton's constitutional challenges because the courts have approved this precise type of condition as "reasonable" under *Lent* (see *People v. Kwizera* (2000) 78 Cal.App.4th 1238, 1240-1241; *People v. Olguin* (2008) 45 Cal.4th 375, 380-381), and Barton cites no authority that a condition of probation that is reasonable under Lent can nevertheless be unconstitutionally vague or overbroad. More importantly, there is nothing "vague" about the condition: it clearly directs Barton to follow any course of conduct communicated to him by the probation officer.

We instead interpret Barton's constitutional challenge to be an assertion the condition is overbroad because it sets no "parameters" and provides no "guidance as to what conduct the probation officer has the authority to [require of Barton]." However, this court rejected the identical assertion in *Kwizera*, *supra*, 78 Cal.App.4th 1238. In *Kwizera*, we observed it is the court that has the power and responsibility to set

22

conditions of probation, and it is the responsibility of the probation officer to administer the conditions and to set the time and place for those things necessary to enforce compliance with the ordered conditions. We concluded:

> "The phrase 'follow such course of conduct as the probation officer prescribes,' as used in condition 6.f[,] is reasonable and necessary to enable the department to supervise compliance with the specific conditions of probation. It does no more. Since the court does not have the power to impose unreasonable probation conditions, it could not give that authority to the probation officer through condition 6.f. When the clear words of Penal Code sections 1202.8 and 1203 are applied, the trial court has authority to empower the probation department with authority to supervise the probation conditions. Condition 6.f does not conflict with [*Lent*], or authorize the probation officer to irrationally tell a defendant 'to jump,' as defense counsel fears. Condition 6.f is a reasonable probation condition to enable the department to supervise compliance with the other probation conditions." (*Kwizera,* at pp. 1240-1241.)

The court in *People v. Olguin, supra*, 45 Cal.4th 375 similarly concluded the probation department's authority to supervise compliance with the conditions of probation does not empower the department to engage in irrational conduct or make irrational demands. Because the condition Barton now challenges is a condition appropriately tailored to the need of probation officers to be able to supervise compliance with those conditions imposed by the court, it is neither vague nor inappropriate for its lawful purpose, but is instead an appropriate grant of authority to the probation department. We therefore reject Barton's constitutional challenges of facial vagueness or overbreadth to this condition.

23

DISPOSITION

The trial court shall amend the abstract of judgment to reduce the restitution fines imposed under Penal Code sections 1202.4 and 1202.45 to the amount of $10,000, and to reflect that the restitution fine imposed under Penal Code section 1202.45 is imposed pursuant to section 1204.45, subdivision (b), and shall be stayed unless Barton's period of mandatory supervision is revoked.  The court shall further amend the order granting mandatory supervision to require that Barton reimburse the probation department the amount of $2,500 to cover replacement costs in the event the GPS equipment is not returned or is damaged.  As so amended, the judgment is affirmed.


McDONALD, Acting P. J.

WE CONCUR:


O'ROURKE, J.


AARON, J.


24